UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TASHEEMA CALLENDER,         )<br>    Plaintiff,                               )<br>                                                 )<br>v.                                              )<br>                                                 )      C.A. 3:25-cv-30155<br>METRO CARE OF SPRINGFIELD  )<br>    Defendants                           )<br>                                                 ) | |

## COMPLAINT AND JURY DEMAND

### PARTIES

1. Plaintiff Tasheema Callender is an individual who resides in Springfield, Hampden County, Commonwealth of Massachusetts.

2. Defendant Metro Care of Springfield ("Metro Care") is an adult in-home care and medical service provider, with a principal address listed as 125 Liberty Street, Springfield, Hampden County, Commonwealth of Massachusetts.

### JURISDICTION AND VENUE

3. Plaintiff brings this action under Title VII of the Civil Rights Act as codified, 42 U.S.C. § 2000e to 2000e-17, along with ancillary state claims, giving this Court federal question jurisdiction under 28 U.S.C. § 1331.

4. Plaintiff's claims arise out of the context of her employment by the Defendant, whose business address is in Springfield, Massachusetts.

1

5. Venue is proper under 28 U.S.C. § 1391, in that the Defendant resides within Western Massachusetts, and the substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Western Massachusetts.

## FEDERAL ADMINISTRATIVE REMEDIES

6. A claim (EEOC Case No. 523-2025-03170) was filed with the Equal Employment Opportunity Commission regarding Defendant's discriminatory actions on May 30th, 2025.

7. Plaintiff subsequently submitted a request to the Equal Employment Opportunity Commission for a Right to Sue Letter.

8. The Equal Employment Opportunity Commission issued a Notice of Right to Sue on July 1, 2025.

## FACTUAL ALLEGATIONS

9. Plaintiff began working at Metro Care of Springfield as a member of their nursing staff on or around April 15, 2024.

10. At the time of her hire, Plaintiff was the only African American employee at Metro Care of Springfield and remained the only African American employee throughout all relevant periods of her employment.

11. On or around May 10, 2024, Plaintiff was diagnosed with low grade b-cell lymphoma, which required her to start chemotherapy.

12. Plaintiff subsequently applied for Paid Family and Medical Leave (PFMLA) benefits.

13. On or around June 20, 2024, Plaintiff's supervisor (employee of Defendant) notified Plaintiff that Plaintiff would need to return to work shortly before they terminated her position.

14. Plaintiff returned to work on July 8, 2024, only to discover that several of her coworkers were aware of her cancer diagnosis.

15. Plaintiff did not share any information surrounding her diagnosis with her coworkers.

16. Plaintiff was deeply uncomfortable with the widespread sharing of her sensitive information.

17. Plaintiff's supervisors, and co-workers who were friends with her supervisors, began calling Plaintiff "dramatic" and "too emotional" with respect to the way Plaintiff was handling her own cancer diagnosis.

18. Plaintiff also faced racial discrimination from her coworkers, who directed racial slurs at her.

19. One of Defendant's employees and co-worker of Plaintiff, while in the context of their employment, referred to Plaintiff using the "N-Word".

20. On or around September 17, 2024, Plaintiff formally reported her supervisor and other coworkers for their racially discriminatory comments to Defendant's Program Director and to the Head of Human Resources.

21. Rather than taking corrective action against the employee who directed a racial slur –the "N-word" –at Plaintiff, Defendant instead promoted the individuals involved.

22. Subsequently, Defendant began to unjustifiably criticize Plaintiff's job performance, cancel client appointments assigned to her, falsely assert that her documentation was incomplete, and reprimand her for subjective matters such as her facial expressions and manner of speaking, including the use of words such as "obviously" during interactions with coworkers.
23. The Head of Human Resources is the daughter of Plaintiff's supervisor.
24. Although Plaintiff made a good faith effort in reporting the disclosure of her cancer diagnosis and other racially discriminatory comments, Plaintiff's supervisor began falsely accusing her of missing patient appointments and failing to complete documentation.
25. Plaintiff did not miss appointments and documented what was necessary.
26. Despite the racial discrimination that she was facing, Plaintiff began working additional overtime hours.
27. Much to Plaintiff's surprise, Plaintiff's supervisor informed her that she would not be compensated for her overtime hours as the company did not want to pay her a higher rate.
28. Upon being told that Plaintiff could not work overtime hours despite her willingness to continue to do so, a similarly situated Caucasian employee received a $47 pay increase for "going above and beyond."
29. Defendant maintained a common practice of allowing its nurses to work from home if they did not have in-person appointments on a certain day.

30. Despite this common practice, Defendant would not allow Plaintiff to work from home after she notified her supervisor and Head of Human Resources about the discrimination she was facing.

31. On or around September 26, 2024, Plaintiff was denied access to her work email from her work-issued phone, despite other nurses and coworkers having access to their employee emails.

32. On or around September 27, 2024, Defendant notified Plaintiff that her PFML was accepted and consequently asked Plaintiff to return her work equipment as soon as possible.

33. On March 5, 2025, Plaintiff informed her supervisor that her physician scheduled additional chemotherapy treatment, leading her to request subsequent Fridays off of work.

34. Plaintiff's request for a change in schedule to accommodate her chemotherapy were ignored despite providing notice from her doctor.

35. Two days after the request, Defendant terminated the Plaintiff without any explanation or prior discussion.

36. Upon Plaintiff's termination, Defendant represented that she would be compensated for mileage expenses she had accrued. However, to date, Defendant has failed to provide the promised reimbursement.

## COUNT I: TITLE VII VIOLATIONS
### 42 U.S.C. § 2000e

37. Plaintiff repeats and realleges paragraphs 1 through 36 of this Complaint.

5

38. Plaintiff, an African-American female, is a member of a protected class under Title VII based on race.

39. At all relevant times, Plaintiff was an employee of the Defendant employer as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

40. Plaintiff was qualified for her position and performed her duties in a satisfactory manner, and even went above and beyond working unpaid overtime.

41. Defendant Metro Care subjected Plaintiff to racial discrimination by allowing other staff members to use racial slurs without any adverse action, despite the Employee Handbook stating, "Metro Care of Springfield will take immediate and appropriate action".

42. Defendant, instead of taking steps to rectify racially discriminatory comments, instead took no action against its employees who used the "N-Word" openly when referring to Plaintiff.

43. Further, when Plaintiff made any complaints about race-related discrimination she was facing, instead of keeping the matters confidential, Defendant's management and employees would spread gossip about Plaintiff's complaints, causing further tension between Plaintiff and Defendant's other employees.

44. After Plaintiff made known the discrimination that she was facing, Defendant began taking steps to ostracize Plaintiff, refusing accommodations, denying overtime (purportedly on the basis of lack of funds,

while at the same time giving bonuses to white employees), denying Plaintiff the same benefits (such as remote work) that were given to other employees who were not black and otherwise making the workplace hostile toward Plaintiff.

45. Plaintiff was subjected to disparate treatment on the basis of race, as she was denied promotions and pay raises, and subjected to termination, while similarly situated employees outside of Plaintiff's protected class were given pay increases for performing the same functions.

46. Defendant knew of its harmful actions, which perpetuated a hostile work environment for the Plaintiff based on her race.

47. Defendant failed to take prompt and appropriate action against the individuals using racial slurs towards the Plaintiff.

48. Plaintiff was subjected to actions, discipline and other decisions made in the workplace to her detriment that those outside of her protected class were not subjected to.

49. Defendant's conduct was willful, intentional, and in reckless disregard of Plaintiff's Title VII rights, which caused the Plaintiff to suffer monetary and non-monetary damages.

## COUNT II: VIOLATIONS OF G.L. c. 151B

50. Plaintiff repeats and realleges paragraphs 1 through 48 of this Complaint.

51. Plaintiff, an African American female, is a member of a protected class under Title VII based on race.

52. At all relevant times, Plaintiff was an employee of the Defendant employer as defined by G.L. c. 151B §1.

53. Plaintiff was qualified for her position and performed her duties in a satisfactory manner and even went above and beyond working unpaid overtime.

54. Defendant Metro Care subjected Plaintiff to racial discrimination by allowing other staff members to use racial slurs without any adverse action, despite the Employee Handbook stating, "Metro Care of Springfield will take immediate and appropriate action".

55. Defendant, instead of taking steps to rectify racially discriminatory comments, instead took no action against its employees who used the "N-Word" openly when referring to Plaintiff.

56. Further, when Plaintiff made any complaints about race-related discrimination she was facing, instead of keeping the matters confidential, Defendant's management and employees would spread gossip about Plaintiff's complaints, causing further tension between Plaintiff and Defendant's other employees.

57. After Plaintiff made known the discrimination that she was facing, Defendant began taking steps to ostracize Plaintiff, refusing accommodations, denying overtime (purportedly on the basis of lack of funds, while at the same time giving bonuses to white employees), denying Plaintiff the same benefits (such as remote work) that were given to other employees

who were not black and otherwise making the workplace hostile toward Plaintiff.

58. Plaintiff was subjected to disparate treatment on the basis of race, as she was denied promotions and pay raises, and subjected to termination, while similarly situated employees outside of Plaintiff's protected class were given pay increases for performing the same functions.

59. Defendant knew of its harmful actions, which perpetuated a hostile work environment for the Plaintiff based on her race.

60. Defendant failed to take prompt and appropriate action against the individuals using racial slurs towards the Plaintiff.

61. Plaintiff was subjected to actions, discipline and other decisions made in the workplace to her detriment that those outside of her protected class were not subjected to.

62. Defendant's conduct was willful, intentional, and in reckless disregard of Plaintiff's rights under G.L. c. 151B, which caused the Plaintiff to suffer monetary and non-monetary damages.

## COUNT III: DISABILITY DISCRIMINATION
### 42 U.S.C § 12101

63. Plaintiff repeats and realleges paragraphs 1 through 61 of this Complaint.

64. At all relevant times, Plaintiff is a qualified individual with a disability as defined by the Americans with Disabilities Act, 42 U.S.C. § 12102(1).

65. Plaintiff, despite her diagnosis, was able to perform the essential functions of her position.

66. Defendant stated that it "complies with, and fully supports, the Americans with Disabilities Act."

67. Defendant had actual knowledge of the Plaintiff's disability when Plaintiff communicated the details of her diagnosis to Defendant.

68. Plaintiff requested reasonable accommodations, including but not limited to the ability to do her documentation work from home (like white employees without disabilities were allowed to) and the ability to take Fridays off to recover from chemotherapy treatment over the weekend.

69. Defendant failed to provide reasonable accommodations to Plaintiff, even forcing her to travel to the office when she only had simple documentation work to complete, which could have easily been done from home, as evidence by Defendant's allowing other employees to do the same.

70. Other similarly situated coworkers of the Plaintiff were allowed to complete their simple documentation tasks at home.

71. Defendant's conduct constitutes unlawful disability discrimination in violation of 42 U.S.C. § 12112(a) and 12112(b).

## COUNT IV: RETALIATION – TITLE VII
### 42 U.S.C. § 2000e-3(a)

72. Plaintiff repeats and realleges paragraphs 1 through 71 of this Complaint.

73. Plaintiff was engaged in a protected activity under Title VII and G.L. c. 151B when bringing her concerns of racial discrimination, requests for accommodation and violation of her privacy rights to the Defendant's Head of Human Resources and Program Director.

74. Plaintiff sought to make individuals in the organization aware of the racial and discriminatory practices of members of her team and supervisor, as well as the fact that her supervisor told other nurses about her cancer diagnosis.

75. As a result of engaging in this protected activity, Plaintiff was subjected to adverse employment actions, including being subjected to discipline and lies from her supervisor.

76. Plaintiff was accused of not completing her work, documentation, and skipping appointments by her supervisor as a result of Plaintiff's complaint to upper management.

77. Defendant subsequently terminated Plaintiff.

78. These adverse actions, including Plaintiff's termination, would not have occurred but for a retaliatory motive against the Plaintiff notifying Defendant about the racial discrimination, disability accommodation requests, and privacy concerns.

**PRAYER FOR RELIEF**

79. Declaration that the Defendant violated Title VII and G.L. c. 151B in discriminating against Plaintiff based on her race.

80. Declaration that Defendant discriminated against Plaintiff by failing to reasonably accommodate Plaintiff's disabilities.

81. Declaration Plaintiff was engaged in protected activity when she requested reasonable accommodations and when she notified Defendant of the racial discrimination that she was facing.

82. Award damages to Plaintiff in the amount provable at trial, plus costs, interest and attorneys' fees.

83. Award punitive damages as allowed under the aforementioned federal and state laws.

84. Any other relief that this Court deems just and proper.

**Plaintiff demands a Jury Trial on all claims.**

Plaintiff, by:

/s/ Ryan P. McLane
Ryan P. McLane
BBO 697464
McLane & McLane, LLC
269 S. Westfield Street
Feeding Hills, MA 01030
Ph.: (413) 789-7771
Fax: (413) 789-7731
ryan@mclanelaw.com
